1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   TYRELL TRAVIS BROWN,                    No. 07 CV 0429 JCW

12              Petitioner,                  ORDER

13        v.

14   KEN CLARK,

15              Respondent.

16   _____/

17

18        Petitioner Brown, a state prisoner proceeding pro se, filed a petition for writ

19   of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his convictions on two

20   counts of making a criminal threat in violation of California Penal Code section

21   422.  His application to proceed in forma pauperis has been granted.  I have

22   reviewed the petition, the respondent's answer, the traverse, and all supporting

23   documents.  I hold that Brown is not entitled to the relief requested and order the

24   petition denied.

25

26

1

## I.

The following is a summary of the facts, taken from the unpublished opinion of the California Court of Appeal, Third District:

In September 2003, the victims, Mary Elva Kouklis and Genevieve Manzo, lived and worked together. On September 24, 2003, at approximately 8:30 p.m., they followed one another home from work in separate cars. Kouklis, who was ahead of Manzo, got out of her car to unlock a gate that blocked their driveway. In order to reach their home, both victims had to drive around a white Chevrolet Caprice "almost blocking the driveway." Kouklis thought it was odd the car was parked so close to their driveway since there were no other cars parked on the street and she took down the car's license plate number.

As Kouklis reached the end of the driveway, she saw a man, who was later identified as defendant, quickly walking toward her with a gun in his hand. Not wanting to die in her "little Ford Escort," she got out and faced him. Defendant raised his gun and began yelling at her for driving too close to his car. She repeatedly apologized, believing she was "pleading for [her] life." Defendant told her, "I could kill you, bitch. You know me. You know my business. And I own these streets."

As Manzo approached defendant and Kouklis, she heard yelling but did not know defendant had a gun. Manzo told defendant: "[T]his is private property. You need to leave." (RT 107) Defendant responded by pointing his gun at her head and stating: "I'm going to kill you, bitch. I'm gonna kill you. You know, I own these streets. You know who I am and what I do." A few moments later, defendant began backing down the driveway and explained: "[T]he only reason I'm not finishing you off now is because of them," pointing to the victims' neighbors.

A few minutes later, Manzo called 911. A police officer came and took a report. A couple of weeks later, the victims attended a neighborhood "Cops and Coffee" meeting and told Sacramento Police Officer Kyle Jasperson about their encounter with defendant.

Officer Jasperson reviewed the police report, ran the license plate number obtained by Kouklis and discovered the car was registered to defendant. While patrolling the victim's neighborhood, Jasperson, who had previous dealings with defendant, saw defendant and asked to speak with him. Defendant agreed and initially "denied pulling the gun on anyone." He later admitted threatening the victims with a toy gun after they nearly hit his car while pulling into their driveway. He explained he was angry because he had recently purchased the car. He admitted yelling at the victims but said he could not remember exactly what he had said because he was

1  "probably either drunk or high on drugs that night."  Defendant gave
2  Jasperson two replica firearms, one black and one chrome, which
   defendant referred to as "toy guns."

3  The victims later identified defendant as the person who
   threatened them and one of the toy guns as resembling the chrome gun
4  used by defendant to threaten them.

5  [Lodged Doc. 3 at 2-4.]  *People v. Brown*, 2005 WL 1635233 at *1-2  (Cal. App.

6  Ct.) (unpublished).

7  A jury convicted Brown of two counts of making a criminal threat in

8  violation of California Penal Code section 422. [Lodged Doc. 3 at 1.] The trial

9  court made findings that Brown had made the threats while released on bail or his

10 own recognizance, for purposes of a two-year sentencing enhancement under

11 California Penal Code section 12022.1; that he had previously been convicted of a

12 serious felony for purposes of doubling his sentence under California's three

13 strikes law, California Penal Code section 1170.12; and that he had served a prior

14 prison term for purposes of a one-year sentencing enhancement under California

15 Penal Code section 667.5(b).  [Lodged Doc. 3 at 1.]  Brown was then sentenced to

16 five years and eight months in state prison – two consecutive eight-month terms for

17 the two threat convictions, doubled due to his prior strike, plus two years'

18 enhancement for committing the crime while released on bail and one year for the

19 prior term in prison. [Lodged Doc. 3 at 2.] The court ordered that the sentence run

20 consecutive to a nine-year sentence previously imposed in a different case and

21 formally reimposed, for a total term of 14 years and eight months. [*Id*.]

22 Brown appealed to the California Court of Appeal, Third Appellate

23 Division, which affirmed his conviction in an unpublished opinion on July 13,

24 2005, but reduced his sentence by one year.  [Lodged Doc. 3.]  On September 28,

25 2005, Brown's petition for review by the California Supreme Court was denied.

26 [Lodged Doc. 5.]  Thereafter, he filed a state habeas petition in Sacramento County

1   Superior Court, which was denied in a written opinion. [Lodged Doc. 8.] His

2   habeas petition was also denied by the California Court of Appeal, Third Appellate

3   District, with only the explanation: "See *In re Hillery* (1962) 202 Cal. App. 2d

4   293." [Lodged Doc. 7.] The California Supreme Court denied his habeas petition

5   without comment. [Lodged Doc. 8.]

6          Brown filed the present federal petition on March 5, 2007.  Respondent's

7   answer was filed on July 16, 2007, and Brown's traverse was filed on July 30,

8   2007.  On December 9, 2008, the case was reassigned to me.

9          This petition is governed by 28 U.S.C. § 2254, as amended by the

10  Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  Section 2254(a)

11  provides that a district court may entertain an application for writ of habeas corpus

12  "only on the ground that [the state prisoner] is in custody in violation of the

13  Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

14         To obtain federal habeas relief, Brown must satisfy either section 2254(d)(1)

15  or section 2254(d)(2).  *See Williams v. Taylor*, 529 U.S. 362, 403 (2000).  As

16  amended, 28 U.S.C. § 2254 provides that:

17          (d) An application for a writ of habeas corpus on behalf of a person in
            custody pursuant to the judgment of a State court shall not be granted
18          with respect to any claim that was adjudicated on the merits in State
            court proceedings unless the adjudication of the claim--
19
                    (1) resulted in a decision that was contrary to, or involved an
20              unreasonable application of, clearly established Federal law, as
                determined by the Supreme Court of the United States; or
21
                    (2) resulted in a decision that was based on an unreasonable
22              determination of the facts in light of the evidence presented in
                the State court proceeding.
23

24  28 U.S.C.A. § 2254.  The Supreme Court interprets section 2254(d)(1) as follows:

25          Under the "contrary to" clause, a federal habeas court may grant the
            writ if the state court arrives at a conclusion opposite to that reached
26          by this Court on a question of law or if the state court decides a case

1
2
3

> differently than this Court has on a set of materially indistinguishable
> facts.  Under the "unreasonable application" clause, a federal habeas
> court may grant the writ if the state court identifies the correct
> governing legal principle from this Court's decisions but
> unreasonably applies that principle to the facts of the prisoner's case.

4

*Williams*, 529 U.S. at 412-13.

5
6

The deferential standard of review under AEDPA requires "that state-court

7

decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19,

8

24 (2002).  A district court generally gives deference to a state court finding of fact

9

and presumes it to be correct.  28 U.S.C. § 2254(e)(1).  Federal courts may address

10

errors of state law only if they rise to the level of a constitutional violation.

11

*Oxborrow v. Eikenberry*, 877 F.2d 1395, 1399 (9th Cir. 1989).  Federal courts are

12

bound by a state's interpretation of its own laws.  *Estelle v. McGuire*, 502 U.S. 62,

13

67-68 (1991); *Himes v. Thompson*, 336 F.3d 848, 852 (9th Cir. 2003).

14

Where, as here, there is no reasoned decision from the state's highest court,

15

the habeas court looks to the last reasoned state court decision.  *Ylst v.*

16

*Nunnemaker*, 501 U.S. 797, 801 (1991); *Van Lynn v. Farmon*, 347 F.3d 735, 738

17

(9th Cir. 2003).  Adjudications by state intermediate appellate courts and state trial

18

courts are entitled to the same AEDPA deference given to a state supreme court.

19

*Medley v. Runnels*, 506 F.3d 857, 863 (9th Cir. 2007) (en banc).  Here, the last

20

reasoned state court decision is that of the California Superior Court for the County

21

of Sacramento.  [Lodged Doc. 8.]

22

## II.

23

Brown's first argument for habeas relief is that the trial judge failed to

24

instruct the jury that evidence of Brown's alleged admissions should be viewed

25

with caution. [Pet. at 3.] This argument relies on California state court precedent

26

requiring that, where an admission by the defendant is used to prove a part of the

5

1   prosecution's case, a trial court has a duty to give a jury instruction sua sponte

2   explaining that the jury are the exclusive judges as to whether the defendant made

3   an admission and whether the statement is true, and that evidence of an oral

4   admission by the defendant outside of court should be viewed with caution.[1]

5   *People v. Zichko*, 118 Cal. App. 4th 1055, 1058-59 (2004).

6        Here, to the extent that Brown asserts that the jury should have been

7   instructed to view with caution his statements to the victims during the crime, he is

8   in error.  California courts have held that the cautionary jury instruction need not

9   be given where the statement at issue itself constitutes the criminal act with which

10  he was charged – making a criminal threat.  *Id*. at 1059-60.

11       To the extent that Brown argues that the jury should have been instructed to

12  view with caution his later statements to police officers, any such error is harmless.

13  "Failure to give CALJIC No. 2.71 is harmless if it is not reasonably probable a

14  result more favorable to the defendant would have been reached absent the error.

15  . . . Here, it is not reasonably probable defendant would have achieved a more

16  favorable result had the court given CALJIC No. 2.71."  *Higgins v. Hedgpeth*, WL

17  1904866 at *15 (E.D. Cal.) (internal citations omitted).

18       To obtain relief in a habeas corpus proceeding for errors in the jury
         charge, a petitioner must demonstrate that the jury instruction error so
19       infected the entire trial that the resulting conviction violates due
         process. . . . In order to make this determination, the court must
20       evaluate the jury instructions in the context of the charge to the jury

21   _____

22       [1]California Jury Instruction No. 2.71 provides: "An admission is a statement
     made by [a] [the] defendant which does not by itself acknowledge [his][her] guilt
23   of the crime[s] for which the defendant is on trial, but which statement tends to
     prove [his][her] guilt when considered with the rest of the evidence. [¶] You are
24   the exclusive judges as to whether the defendant made an admission, and if so,
     whether that statement is true in whole or in part. [¶] [Evidence of an oral
25   admission of [a][the] defendant [Evidence of an [oral admission of [a] [the]
     defendant not contained in an audio or video recording and not made in court
26   should be viewed with caution.]" CALJIC 2.71.

1   and the entire trial process. . . . [I]f the court determines the instruction
    violated petitioner's due process rights, he can only obtain relief if the
2   error had a substantial and injurious effect or influence in determining
    the jury's verdict. . . . Trial errors that do not meet this test are deemed
3   harmless.

4   *Id*. (internal quotation marks, citations and alterations omitted).  Here, any error

5   was harmless.  The jury received comprehensive instructions cautioning that:

6   (1)"before an inference essential to establish guilt may[]be found to have been

7   proved beyond a reasonable doubt, each fact or circumstance upon which the

8   inference necessarily rests must be proved beyond a reasonable doubt"; (2) "You

9   are the sole judges of the believability of a witness and the weight to be given to

10  the testimony of each witness"; (3) "You are not required to decide an issue of fact

11  in accordance with the testimony of a number of witnesses which does not

12  convince you"; and (4) "You should give the testimony of a single witness

13  whatever weight you think it deserves."  [Lodged Doc. 11 at 165-67.]  These

14  instructions  provided the jury with a proper framework for evaluating the evidence

15  and clarified that the jury need not take the victims' or officer's testimony

16  regarding Brown's out-of-court statements as true; they were free to reject that

17  testimony as not credible.  "[W]e presume jurors follow the court's instructions

18  absent extraordinary situations."  *Tak Sun Tan v. Runnels*, 413 F.3d 1101, 1115

19  (9th Cir. 2005).

20          Moreover, looking at the trial as a whole, the court's failure to instruct the

21  jury that Brown's statements should be viewed with caution would most likely not

22  have changed the outcome.  Brown's counsel did not seek to convince the jury that

23  Brown did not make the statements at issue.  Rather, the defense strategy was to

24  convince the jury that Brown's altercation with the victims had simply been a

25  verbal disagreement that did not rise to the level of a criminal threat. [Lodged Doc.

26  11 at 101, 127-28.]  Indeed, in closing argument, Brown's counsel characterized

7

the case as involving "felony bad manners," a mere "disturbance of the peace . . . that ought to go before Judge Judy," but that instead had been exacerbated by society's gender and racial stereotypes regarding black male aggression toward white females. [Lodged Doc. 11 at 183, 186-87.] Brown's counsel stated, "we're not claiming it wasn't him or he wasn't there or this didn't happen," but rather simply argued that the issue was "whether or not his conduct is such as would reasonably lead the two female complaining witnesses to be in sustained fear," as required by the California criminal threat statute.  [Lodged Doc. 11 at 184.]

In sum, given the other cautionary jury instructions and the fact that the defense did not dispute that Brown had made the statements, I conclude that it is not "reasonably probable a result more favorable to the defendant would have been reached" had the trial court given a cautionary instruction regarding Brown's alleged admissions.  *See Higgins*, 2010 WL 1904866 at *15.

**III.**

Brown also claims that he is entitled to habeas relief because his sentence was "improperly enhanced twice with the same prior." [Pet. at 3.] He lists "Ground 5" of his petition as "Illegal use of prison prior prison term, 'And consolidation of two previous cases; Petitioner did not consent to Pen. C. 1387.2 Procedings [sic]," and "Ground 6" as simply, "Improper Prison Sentence."  [Pet. at 14-15.]  He alleges that his prison term should be 56 months, not 60. [Pet. at 22.] His argument is difficult to follow, but he urges that this case was "illegally consolidated" with another criminal case against him. [Pet. at 22.]

Looking at the record, I construe these cryptic grounds to be a repetition of an argument he made on direct appeal, regarding the fact that the trial court used the same prior prison term to impose a one-year enhancement in both this case (case number 03F08676) and in another case involving a different, unrelated

charge against him (case number 03F04345). [Lodged Doc. 3 at 9.]  The state

appellate court *agreed* that the trial court had erred in imposing the prior prison

term enhancement more than once, and ordered that the one-year enhancement for

that prior prison term be stricken in this case. [Lodged Doc. 3 at 9-10.] Therefore,

Brown's argument of sentencing error has already been remedied.

In his discussion of the sentencing issue, Brown cites to California Penal

Code section 1382(a)(1), which deals with dismissal of a case when an information

is not timely filed, and California Penal Code section 1387.2, which deals with

rearraignments.  It is unclear how these statutes are relevant to his sentencing, or

indeed to this case at all; he seems to be invoking those statutes in relation to case

numbers 01F05909 and 0[3]F04345, and not in relation to the case before this

court (case number 03F08676).  To the extent Brown is trying to make some other

argument about his sentencing and/or those other criminal cases, it is so vague and

incomprehensible that he has failed to demonstrate that he has a claim that

implicates the Constitution, laws or treaties of the United States.  28 U.S.C. §

2254(a).

### IV.

Brown's next claim is that he was illegally detained by a police officer in

violation of the Fourth Amendment, and interrogated in violation of his Fifth

Amendment right against self-incrimination under *Miranda v. Arizona*, 384 U.S.

436 (1966).  He states that he was leaving a store when Officers Jasperson and

Smith stopped him, drew their guns, and told Brown to lay across the hood of their

car. [Pet. at 13.] He alleges that the officers searched him and put him in the back

of the car, and then interrogated him in violation of his *Miranda* rights, asking him

"about guns and shootings" in the area.  [Pet. at 13-14.] He asserts that he told

them he "did not know anything about what they were talking about," and asked

them if he was under arrest, and they told him he was not. [Pet. at 14.]  He says he asked to leave but was denied permission to do so. [Pet. at 6.] He says they left him in the car while they talked on their telephones and then searched the area and found a brown paper bag containing a handgun, after which they arrested him. [Pet. at 14.]

This recital is different from Officer Jasperson's testimony at trial.  The jurors heard that Officer Jasperson saw Brown leaving a store and called out the car window to ask Brown if they could talk to him. [Lodged Doc. 11 at 137-38.] According to Officer Jasperson, Brown stopped to talk, and Officer Jasperson asked Brown to have a seat in the back of the police car, which Brown did.  [*Id.* at 138-39.] Brown asked Officer Jasperson "what this was about," and Officer Jasperson told Brown that he was following up on a reported incident where Brown supposedly pulled a gun on somebody. [*Id.* at 139.] Brown denied doing so. [*Id.*] At that point, Officer Jasperson exited the car and tried to telephone the two victims of Brown's threat, to see if they were available to come identify Brown as the culprit. [*Id.* at 139-40.] When the victims did not answer his call, Officer Jasperson asked two other officers to stay with Brown while Officer Jasperson went to the victims' home, just around the block. [*Id.* at 140.] The victims were not at home, and Officer Jasperson returned to his car about ten minutes later. [*Id.*] When he returned, he learned that Brown had begun to talk to the two other officers about the fact that he owned some toy guns. [*Id.* at 140-41.] Brown told Officer Jasperson that the guns were at his home, and offered to show the guns to Officer Jasperson to prove they were not real guns. [*Id.* at 141.]  Brown and the police went to Brown's home, at which point Brown told them the guns were at his other house; Brown then made a phone call and instructed an unknown person to bring the guns to a nearby location. [*Id.* at 142-43.] At the appointed place, another

1    man brought the guns to the police, who confirmed that the guns were indeed

2    replicas and not real firearms. [*Id*. at 143.] At that point, Officer Jasperson recited

3    to Brown his *Miranda* rights and Brown agreed to talk to Officer Jasperson.

4    Brown then admitted that he had been angry at the women because he thought they

5    had almost hit his new car, so he got out of his car and walked towards the women,

6    pointed his gun at them and yelled at them, although he could not recall what he

7    had said.  [*Id*. at 144-45.]

8         Factual dispute aside, however, Brown's Fourth Amendment claim is

9    denied.  First, it is unclear what evidence he believes should have been suppressed

10   under the Fourth Amendment.  Second, and more important, there is no indication

11   that he was not given a chance to raise a Fourth Amendment argument in state

12   court.  "Under California law, a defendant can move to suppress evidence on the

13   basis that it was obtained in violation of the [F]ourth [A]mendment." *Gordon v.*

14   *Duran*, 895 F.2d 610, 613 (9th Cir. 1990) (citing Cal. Penal Code § 1538.5).

15   Where a defendant  "had an opportunity in state court for 'full and fair litigation'

16   of his [F]ourth [A]mendment claim, the Constitution does not require that [he] be

17   granted habeas corpus relief on the ground that evidence obtained in an

18   unconstitutional search or seizure was introduced at his trial."  *Id*. at 613-14; *see*

19   *also Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996) ("A Fourth

20   Amendment claim is not cognizable in federal habeas proceedings if a petitioner

21   has had a full and fair opportunity to litigate the claim in state court. . . . The

22   relevant inquiry is whether petitioner had the opportunity to litigate his claim, not

23   whether he did in fact do so or even whether the claim was correctly decided").

24        I also reject Brown's *Miranda* argument.  By invoking *Miranda*, Brown

25   seems to be arguing that his statements while he was sitting in the police car were

26   not voluntary, but were coerced under pressure.  However, his habeas petition does

1  not specify any incriminating statements that he made during that time; to the

2  contrary, his petition asserts that he told them he did not know what they were

3  talking about. [Pet. at 14.] Thus, Brown's petition has not alleged that he said

4  anything self-incriminating, and therefore has not alleged facts that, if true, would

5  indicate a *Miranda* violation.

6                                      **V.**

7          Brown also argues that he is entitled to habeas relief on due process grounds

8  because an impermissible "irreparable suggestion" was made to one of the victims

9  during a photograph lineup. [Pet. at 6.] He alleges that sometime between

10  September 24, 2003 (the night of the incident) and September 28, police created a

11  photograph lineup, including Brown's photograph. [Pet. at 10-11, 15.]  Brown says

12  that Officer Villegas showed this initial photograph lineup to Ms. Manzo, who did

13  not recognize any of the pictures as the person who had threatened her. [Pet. at 11.]

14  According to Brown, on October 4, a second photograph lineup was performed by

15  a different police officer, Officer Jasperson, also including a photograph of Brown;

16  in this second lineup, both victims identified Brown's picture as the person who

17  had threatened them. [Pet. at 16-18.]  Brown contends that his inclusion in the

18  second lineup was impermissibly suggestive. [Pet. at 18.] Although he does not

19  articulate a clear argument, his theory is presumably that the second lineup was

20  impermissibly suggestive as to Ms. Manzo because she had been shown his

21  photograph before, and thus, her identification of him during the second lineup

22  may not have been because she recognized him from the crime, but simply because

23  she recognized him from the first lineup.

24          The trial transcript indicates that on October 4, both Ms. Manzo and Ms.

25  Kouklis were shown a photograph lineup, separately, and both identified Brown as

26  the person who threatened them. [Lodged Doc. 11 at 148-49.] Both women also

identified him in person at trial. [Lodged Doc. 11 at 97-98, 119-20.] As to evidence
of an earlier lineup prior to October 4, Ms. Manzo testified only that she was
shown an earlier photograph lineup and did not recognize anyone in the lineup.
[Lodged Doc. 11 at 124.] The trial testimony does not indicate whether Brown's
photograph was, in fact, included in the earlier lineup; the only evidence in the
record is that Ms. Manzo recognized no one.  Brown seems to believe that his
photograph was in the earlier lineup, but does not explain the basis for that belief,
and he does not point to any evidence in the record to show that.  He urges that his
photograph must have been in the earlier lineup because the victims had given the
police the license plate of the vehicle of the person who threatened them, and
Brown was the person to whom the vehicle was registered. [Pet. at 10-11, 15.]  But
it is purely speculation that the first lineup was created using a photograph of the
person to whom the car was registered.  That is the method that Officer Jasperson
testified he used during the *October 4* lineup, but there is no evidence anywhere in
the record as to how the first lineup was created. [Lodged Doc. at 135-37.]  It is not
enough for Brown to speculate that his photograph must have been in the first
lineup.

Even assuming that Ms. Manzo saw Brown's photograph in two different
lineups, Brown is not entitled to habeas relief on this ground.  First, even if the
second lineup was impermissibly suggestive as to Ms. Manzo, there is no
indication that it was impermissibly suggestive as to Ms. Kouklis.  Trial testimony
indicates that Ms. Kouklis picked Brown's photograph from the lineup separately
from Ms. Manzo, and had no opportunity to discuss the lineup with Ms. Manzo
prior to making her identification. [Lodged Doc. 11 at 148-49.] Brown cites no
evidence, and I have not found any, to show that Ms. Kouklis had ever seen
Brown's photograph in any lineup prior to October 4.

13

1    Moreover, even if the second lineup was impermissibly suggestive as to

2    Ms. Manzo because she had seen his photograph in an earlier lineup, clearly

3    established Supreme Court law allows identifications taken at impermissibly

4    suggestive photographic lineups to be admitted so long as the identification is

5    reliable.  *Manson v. Brathwaite*, 432 U.S. 98, 105-06 (1977).  Factors to be

6    considered in assessing reliability are: the extent to which the witness had an

7    opportunity to view the criminal at the time of the crime; the witness's degree of

8    attention, the accuracy of the witness's prior description of the criminal, the level

9    of certainty demonstrated by the witness at the confrontation, and the length of

10   time between the crime and the confrontation.  *United States v. Monks*, 774 F.2d

11   945, 956 (9th Cir. 1985).  Such factors should be weighed against any corrupting

12   effect of the suggestive identification procedure.  *Id.*  Here, Ms. Manzo had an

13   opportunity to focus intently on the criminal for at least several seconds at close

14   range while he yelled at her and pointed a gun so that it was "almost touching" her

15   head, and for several seconds thereafter while he backed away, still pointing the

16   gun and walking backwards down a long driveway. [Lodged Doc. 11 at 108-12.]

17   She identified Brown in the second photograph lineup on October 4, 2003, less

18   than two weeks after the threats were made, and told the jury that it "wasn't hard"

19   to pick Brown out of the October 4 lineup because "I just would never forget that

20   face." [Lodged Doc. 11 at 81, 137, 146.] Thus, evidence regarding the second

21   lineup was admissible even as to Ms. Manzo, because her identification was

22   reliable even despite any arguably impermissible suggestions.

### VI.

24   Brown's petition also makes a related argument regarding the lineups,

25   urging that his "right to equal protection and suppression of exculpatory evidence"

26   was violated because of "denial of both photo line ups given by authorities." [Pet.

at 7.] Although the petition is unclear, he seems to be arguing that the fact that Ms. Manzo did not identify Brown in the first photograph lineup was exculpatory evidence which the prosecution failed to disclose to the defense as required by *Brady v. Maryland*, 373 U.S. 83, 87 (1963). [Pet. at 20-21.]

But, as explained above, he offers no factual basis for his belief that his photograph was included in the first lineup; therefore, Ms. Manzo's failure to pick any photograph out of the first lineup is not necessarily exculpatory at all. However, even if there were some basis for that belief, Brown still is wrong in his *Brady* argument.

It is true that the rule of *Brady* "is not confined to evidence that affirmatively proves a defendant innocent: Even if evidence is merely favorable to the accused, its suppression violates *Brady* if prejudice results." *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004). However, here, even assuming that Ms. Manzo's failure to pick any photograph from the first lineup has some exculpatory value favorable to Brown, and that the prosecution did not disclose that evidence to the defense, Brown must also show that he suffered prejudice – "that is, that there is a reasonable probability that the outcome of the trial would have been different had the evidence been disclosed." *Id*. at 913. No such prejudice was suffered here. There was ample evidence identifying Brown as the person who had threatened the victims. First, the victims testified that the person who threatened them had become angry because they had gotten too close to his car; from this testimony, a jury could infer that the perpetrator owned the car. [Lodged Doc. 11 at 89-90, 108.] The victims reported the license plate number of the car to the police, who identified Brown as its registered owner. [*Id*. at 135.] Second, both victims positively identified Brown as the person who threatened them, both in the October 4 lineup and at trial. [*Id*. at 97-98, 119-21.] Third, Officer Jasperson testified at

trial that Brown admitted to police that he had become angry with the women
because they had almost hit his car, and admitted that he had pulled a gun on them
and yelled at them, although he could not recall exactly what he had said. [*Id*. at
144-45.] Officer Jasperson also told the jury how Brown had explained that the
guns were not real guns, and had in fact provided the police with two replica guns,
one black and one chrome. [*Id*. at 140-43.] Officer Jasperson said he then showed
the two replica guns to the victims, who both recognized the chrome gun as the gun
that had been pointed at them. [*Id*. at 150-51.] The victims also testified at trial
that the chrome gun Brown gave to police looked like the gun with which they had
been threatened. [*Id*. at 98, 121-22.] Finally, even if Brown and his counsel were
totally unaware that there had been a photograph lineup prior to October 4, it is
undisputed that during the trial, they learned of the existence of the earlier lineup.
Ms. Manzo testified that, prior to October 4, a different detective had shown her
another lineup in which she recognized no one. [*Id*. at 124.] Yet Brown's counsel
did not cross-examine Ms. Manzo about that lineup to try to get more information,
and he did not question Officer Jasperson about whether Brown's photograph had
been included in the first lineup. In fact, Brown's counsel did not attempt to
dispute that Brown was the person who had yelled at the women – he told the jury,
"we're not claiming it wasn't him or he wasn't there or this didn't happen." [*Id*.]
Rather, his trial strategy was to convince the jury that the confrontation had not
risen to the level of a criminal threat that would reasonably put the victims in
sustained fear. [*Id*.]

Given all the other evidence before the jury tying Brown to the crime, and
the fact that Brown's trial strategy did not dispute that he had had an altercation
with the women, I conclude that there was not a reasonable probability that the
outcome of the trial would have been different had Brown been aware that Ms.

Manzo had been shown an earlier lineup and had not identified a suspect in that lineup.  Because Brown suffered no prejudice from this purported *Brady* violation, I reject his claim.

## VII.

Brown next argues that his rights were violated because he was denied a chance to cross-examine Billy Jordan, who told the victims that Brown was the person who had threatened them. [Pet. at 7, 21.] In the same vein, he appears to argue that his due process rights were violated because he was implicated by Jordan, who was not present at the crime scene. [Pet. at 6, 7, 21.]

Jordan appears in a police report submitted with Brown's petition.  The report, by Officer Villegas, indicates that on September 28, 2003, Ms. Manzo contacted police to give them some additional information regarding the incident on September 24.  Ms. Manzo apparently told Officer Villegas that her friend, Jordan, had seen the person who had threatened Ms. Manzo walking near Ms. Manzo's house. [Pet. at 30.] Jordan told Ms. Manzo that the suspect, a local drug dealer, had spoken to Jordan and told Jordan his name was "T." [*Id*.] The suspect asked Jordan what he was doing hanging around the two women who had called the police on him, and told Jordan that he (the suspect) planned to finish off what he had started. [*Id*.] Jordan Jordan is also alluded to in the probable cause report completed by Officer Jasperson, in which Officer Jasperson states that the victims reported that "a subject known as 'T' pulled a silver handgun on them," and Officer Jasperson knew from prior experience with Brown that Brown went by the nickname "T."  Thus, Officer Jasperson's probable cause report appears to refer to Officer Villegas's report, in which Ms. Manzo stated that Jordan told her the suspect's nickname was "T."  [Pet. at 29.]

However, there was no mention of Jordan at trial, and there was no mention of Brown using the nickname of "T." Indeed, Brown's attorney, prior to opening statements and outside the presence of the jury, told the court that he would object to any "hearsay references to an unnamed person named Billy." [Lodged Doc. 11 at 76-77.] The prosecution indicated that it would not be calling Officer Villegas, so there should be no problem with any evidence regarding Jordan. [*Id*.] Neither the two victims nor Officer Jasperson mentioned Jordan.  Officer Villegas's report and Officer Jasperson's probable cause report were not exhibits at trial. [Lodged Doc. 11 at Exhibit Index.] At one point in the trial, Ms. Kouklis mentioned that, after the incident, "neighbors came up to us and said that he was threatening them about us." [*Id*. at 103.] This may have been a reference to Jordan's warning memorialized in Officer Villegas's report.  However, Brown's counsel immediately objected, and the court ruled: "What the neighbor said may be stricken." [*Id*.] Likewise, at one point Ms. Manzo began to testify that, after the original threats, she was afraid "because I knew that I had heard this, that he was out there and he was like – "; but before she could even finish the sentence, Brown's counsel objected, and the court sustained the objection and struck the objected-to testimony. [*Id*.]  Brown cannot set forth any cognizable claim regarding Jordan, because no evidence related to Jordan was before the jury at all, and thus no evidence tied to Jordan was used to convict Brown at trial.

## VIII.

Brown also seeks habeas relief on the ground that he was denied the effective assistance of counsel.  He argues that his counsel failed to present evidence that Brown's confession was false and/or that Brown did not make the confession.  [Pet. at 7.]  He also complains that his counsel failed to investigate several areas, including "the supplementary report . . . regarding the statement by

'Billy Jordan,'" "the gun shots outside the victims['] house," and the first photograph lineup, which was allegedly favorable to Brown in that the victim did not identify Brown. [Pet. at 18-19.]

To demonstrate ineffective assistance of counsel, Brown must show (a) that his counsel's performance was deficient, and (b) that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show deficient performance, he must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. Counsel is "presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. Counsel's performance must fall "outside the wide range of professionally competent assistance" before it may be deemed deficient. *Id*. To show prejudice, Brown must show that his "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. Brown "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

The California Superior Court correctly identified the proper standard for evaluating Brown's ineffective assistance of counsel claims by citing *Strickland*. [Lodged Doc. 8 at 3.] I conclude that the Superior Court did not "appl[y] *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). Brown did not show either a constitutionally deficient performance or prejudice.

Brown first argues that his counsel failed to present evidence that Brown's confession was false and/or that Brown didn't make the confession. [Pet. at 7.]

1   This decision was not outside the range of professionally competent assistance,

2   particularly because the record "reveals the futility" of such a position.  *See*

3   *LaGrand v. Stewart*, 133 F.3d 1253, 1272 (9th Cir. 1998) (holding that counsel's

4   decision not to argue that the defendant had killed his victim impulsively while in a

5   rage, and not with premeditation, was not ineffective where the record showed that

6   an impulsivity defense would have been futile).  Here, Brown's counsel was no

7   doubt aware that Officer Jasperson would be testifying regarding the admissions

8   Brown made to the police.  Brown's counsel cross-examined Officer Jasperson

9   about Brown's admissions, asking him again whether Brown "didn't clam up,

10  didn't take the fifth, he answered your questions?" [Lodged Doc. 11 at 151-52.]

11  Brown's counsel also pressed Officer Jasperson as to his account that Brown had

12  agreed to cooperate in retrieving the toy guns, and didn't make police get a search

13  warrant. [*Id*.] The only way to further call into doubt Officer Jasperson's testimony

14  would have been to put Brown on the stand.

15        There was also other evidence linking Brown to the confrontation with the

16  two women, even without Brown's admissions (for example, the victims'

17  identifications of Brown at the October 4 lineup and at trial, and the victims'

18  testimony that the person who threatened them was the owner of a specific car,

19  which was later found to be registered in Brown's name).  In light of that record,

20  Brown's counsel apparently made a strategic decision to defend the case not by

21  trying to convince the jury that Brown was not the person who had yelled at the

22  women, but instead by trying to convince the jury that the confrontation had not

23  risen to the level of a criminal threat that would reasonably cause the victims to be

24  in sustained fear.  I conclude that was not an unreasonable strategy.  Moreover,

25  even if it were, I conclude that there is not a "reasonable probability" that, but for

26  his counsel's alleged error, the result of the proceeding would have been different.

1  Again, there was sufficient other evidence tying Brown to the crime on which a
2  jury could have convicted him even without his own admissions.

3       I next turn to Brown's complaint that his counsel failed to investigate "the
4  supplementary report . . . regarding the statement by 'Billy Jordan,'" "the gun shots
5  outside the victims['] house," and the first photograph lineup, which was allegedly
6  favorable to Brown in that the victim did not identify Brown. [Pet. at 18-19.] As
7  has already been discussed, no evidence regarding Jordan was presented to the
8  jury, so it is difficult to conceive of a reason why his counsel's failure to
9  investigate Jordan's statements further could have been unreasonable or prejudicial
10 to the outcome of the case.

11      As to the issue of the gun shots outside the victims' house, this is an allusion
12 to Ms. Kouklis's testimony at trial that, the morning after she and Ms. Manzo were
13 threatened in their driveway, "a car drove up and shot out the car window twice,"
14 but that she did not see who did it. [Lodged Doc. 11 at 103.] Similarly, Ms. Manzo
15 testified that, the day after the incident, "there was somebody that drove by my
16 house and shot a couple rounds off.  They came back a half hour later and shot off
17 some more, so I just felt like threatened." [Lodged Doc. 11 at 116.]  First,
18 assuming that Brown's counsel did not investigate the shooting, such a decision
19 was not outside the range of professional judgment.  It is unclear how Brown might
20 have benefitted from further investigation of the gunshots.  It may be that the
21 defense could have shown that the gunshots never happened, or that they were not
22 fired by Brown, but that is purely speculative.  Furthermore, the prosecution was
23 not trying to prove that Brown had fired the shots, and there is no reason to believe
24 the jury would have concluded he did (particularly given that the jury heard that
25 Brown's guns were not real, and that the victims lived in a crime-ridden
26

21

neighborhood, such that the shots could have been fired by an unidentified criminal).

I also conclude that Brown suffered no prejudice due to his counsel's failure to investigate the gunshots. The victims' testimony regarding the drive-by shooting was elicited as part of the prosecution's attempt to prove that Brown's threats caused the victims "reasonably to be in sustained fear" for their own or their families' safety, a necessary element of the crime. [Lodged Doc. 11 at 169.] Testimony regarding the shooting tended to prove that they continued to be in fear the next day. However, there was ample other evidence at trial from which the jury could have found the element of sustained fear. Ms. Kouklis testified that she was scared 20 minutes later when the police arrived; that for some time afterward, she was "jumpy" when she would see someone walk by her driveway; that she would now "have second thoughts about even talking to anybody who's walking by"; and that indeed, being threatened at gunpoint had so affected her that she was "not over it yet" at the time of trial. [Lodged Doc. 11 at 95-96.] Likewise, Ms. Manzo testified that the day she was threatened at gunpoint was "the worst day of [her] life"; that she did not think she "could ever be more afraid than that"; that afterward she feared "having somebody, you know, come back and get me"; that she was "afraid . . . that [she] would run into him again"; and that she was still fearful at the time of the lineup on October 4. [*Id*. at 114-16, 122.] Officer Jasperson testified that, on October 4, the victims told him they did not want to be seen talking to him in public because they were afraid of retaliation by the person who had threatened them. [*Id*. at 148.] Thus, even speculating that further investigation might have established either that the gunshots did not happen or that someone other than Brown was the perpetrator, there is not a "reasonable probability" that the outcome of the trial would have been different.

1    Brown also complains that his counsel failed to investigate the first

2    photograph lineup, which was allegedly favorable to Brown in that Ms. Manzo did

3    not identify Brown. [Pet. at 18-19.] As already discussed, Brown offers no more

4    than speculation that his photograph was in that first lineup at all; it is equally

5    speculative that, had Brown's counsel investigated this first photograph lineup, he

6    might have learned that Brown's photograph was included.  Moreover, even if

7    investigation might have established that Ms. Manzo failed to recognize a

8    photograph of Brown in the first-lineup, there is not a reasonable probability that

9    the outcome of his trial might have been different as a result of such investigation.

10   There was significant additional evidence identifying Brown as the person who had

11   yelled at the women, including his ownership of the car that allegedly prompted the

12   altercation, the identification of Brown by *both* victims during the October 4 lineup

13   and the trial, and his own admissions to police.  There is not a reasonable

14   probability that the jury, upon learning that Ms. Manzo had failed to identify

15   Brown in an earlier lineup, would have disregarded all of that additional evidence

16   tying Brown to the threats.

17       Finally, Brown asserts that his counsel "argu[ed] against his client" and

18   "never discussed the discovery motion" with Brown, "nor ever consulted for a

19   defense." [Pet. at 18.] He does not specify how he believes his counsel argued

20   against him, sheds no light on what "discovery motion" he is referring to, and

21   presents no facts to support his conclusory statement that his counsel "[n]ever

22   consulted" with him.  "Conclusory allegations which are not supported by a

23   statement of specific facts do not warrant habeas relief."  *Cox v. Del Papa*, 542

24   F.3d 669, 681 (9th Cir. 2008) (*citing James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).

25       In sum, Brown did not show a constitutionally deficient performance or

26   prejudice as to his counsel's handling of the issues of Brown's own admissions to

23

1   police, nor with regard to investigation of the issues of Jordan, the drive-by

2   shooting, or the first lineup.  His claim that his trial counsel provided

3   constitutionally inadequate assistance is denied.

4                                           **IX.**

5          Brown, in his traverse, suggests an additional ground for habeas relief; he

6   asserts that Officer Jasperson "used suggestive comments" during the lineup

7   (presumably meaning the October 4 lineup), and that "suggestive comments could

8   have been made" at the lineup. [Traverse at 5-6.] This argument does not appear in

9   Brown's petition, and was raised for the first time at the traverse phase of his

10  federal habeas proceedings, after the respondent's answer was filed.  "A Traverse

11  is not the proper pleading to raise additional grounds for relief."  *Cacoperdo v.*

12  *Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994).  Although a district court has

13  discretion to consider a claim raised for the first time in a traverse, *see Williams v.*

14  *Kramer*, 2009 WL 2424582 at *3 (E.D. Cal.), *citing, inter alia, Jackson v. Roe*,

15  425 F.3d 654, 656 n.1 (9th Cir. 2005), I decline to exercise that discretion here,

16  particularly where the additional "claim" consists of no more than speculation.

17  A habeas petition may be dismissed without a hearing where it consists of

18  "conclusory, unsworn statements unsupported by any proof or offer thereof."

19  *Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir. 2001).

20                                          **X.**

21         In conclusion, I hold that the California Superior Court's decision was not

22  contrary to clearly established Supreme Court precedent; it did not "appl[y] a rule

23  that contradicts the governing law" set forth by the Supreme Court, and it did not

24  "confront[] facts that are materially indistinguishable from" a Supreme Court

25  decision and arrive at a different result than the Supreme Court.  *Williams v.*

26  *Taylor*, 529 U.S. at 405.  The Superior Court's decision was not "an unreasonable

24

application of" clearly established Supreme Court precedent, *id*. at 407, and the decision was not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2). Brown's petition for a writ of habeas corpus is denied.


DATED: August 10, 2010                        /s/ J. Clifford Wallace
                                        _____
                                                J. Clifford Wallace
                                                United States Circuit Judge